# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

LANA M. PAAVOLA, individually, and )
as Administrator of the ESTATE )
OF JOEL D. PAAVOLA, deceased )
)
        **Plaintiffs,** )    Civil Action No.: _____
)
        **v.** )    **Jury Demand**
)
UNITED STATES OF AMERICA, )
DISTRICT OF COLUMBIA, and HOPE )
VILLAGE, INC., )
)
        **Defendants.** )

## COMPLAINT

Plaintiffs Lana Paavola, individually, on her own behalf; as Administrator of the Estate of Joel D. Paavola; and on behalf of the wrongful death beneficiaries of Joel D. Paavola, brings this action seeking all available damages arising from the wrongful death of her husband, Joel Paavola, on June 4, 2018 and alleges as follows:

## NATURE OF ACTION

1. This is a wrongful death and/or survival action for all recoverable compensatory and punitive damages against Defendants (1) the United States of America, (2) the District of Columbia and (3) Hope Village, Inc. The Defendants, by virtue of their negligent acts and/or omissions, directly and proximately caused the premature and wrongful death of Joel D. Paavola. Due to Mr. Paavola's murder, Lana Paavola, individually, and the children of Mr. and Ms. Paavola, have experienced significant damages, including loss of earned income, loss of services, and loss of consortium. Joel Paavola experienced significant pain and suffering prior to his wrongful death.

1

2. This is also a breach of contract action, as Plaintiffs were third-party beneficiaries of contracts in place amongst the Defendants governing pretrial detainees.

3. As alleged in greater detail below, Defendants permitted and maintained a culture of lax detention and supervision of pretrial detainees, permitting detainees to voluntarily leave custody. In many cases, Defendants erroneously released pretrial detainees. These actions threatened the safety of the public and led to direct harm.

4. In this case, Defendants negligently permitted Dominic Micheli to leave custody of Hope Village, and/or failed to notify the appropriate parties of his departure, allowing Mr. Micheli to viciously murder Joel Paavola with a hatchet. The Defendants' errors in Mr. Micheli's detention were part of a lengthy pattern by the Defendants of negligently managing pretrial detainees in their custody. Prior to 2018, Defendants were on notice of this history, but failed to take action, proximately causing Mr. Paavola's murder.

## PARTIES, VENUE AND JURISDICTION

5. Plaintiff, Lana M. Paavola, is an adult resident of Williamson County, Franklin, Tennessee. She lived in Franklin, Tennessee at the time of the events in this lawsuit. At the time of filing of this lawsuit, Ms. Paavola is a current resident of Williamson County, Franklin, Tennessee. On July 16, 2018, Ms. Paavola was appointed as the administrator of the Estate of Joel David Paavola (see Exhibit A to the Complaint).

6. Joel Paavola was murdered on June 4, 2018 due to Defendants' negligence. Prior to Mr. Paavola's murder, Mr. and Ms. Paavola had been married for 18 years. Mr. Paavola was the father of five (5) children. Mr. Paavola's murder occurred at "The Balance," a fitness facility owned by Mr. Paavola, located in Nashville. At the time of his death, Mr. Paavola was a Tennessee resident, living with Ms. Paavola.

7. The United States of America is a Defendant due to the actions and/or omissions of the Court Services and Offender Supervision Agency (CSOSA) and/or the Pretrial Services Agency (PSA). These independent federal agencies are charged, under 18 U.S.C.A. §3154, with supervision of detention of certain pretrial criminal defendants in the District of Columbia while the arrestees await trial in the U.S. District Court. Presuit notice, as required by the Federal Tort Claims Act (FTCA) was provided to the Office of General Counsel at 633 Indiana Avenue Northwest, Washington, D.C. 20004 on September 26, 2018. A certified mail return receipt was received on October 8, 2018.

8. The District of Columbia ("D.C.") is the capital of the United States of America. The District of Columbia oversees the D.C. Department of Corrections, a correctional agency responsible for the adult jails and other adult correctional institutions in the District of Columbia. The D.C. Department of Corrections contracts with the federal government to detain persons arrested in D.C. on certain federal charges while those persons await trial in the U.S. District Court for the District of Columbia. The District of Columbia received timely notice of this action, as required by DC St. §12-309. The District of Columbia was provided with notification on September 26, 2018 at the (1) Office of the Secretary, John A. Wilson Building, 1350 Pennsylvania Avenue N.W., Suite 419 Washington, D.C. 20004, and the (2) Office of the Attorney General for the District of Columbia, 441 4th Street N.W., Room 600-South, Washington, D.C. 20001. The District of Columbia acknowledged receipt of presuit notice on October 10, 2018.

9. Hope Village, Inc. is a privately owned entity that owns, leases, operates, and/or manages a halfway house facility at 2840 Langston Place, S.E., Washington, D.C. 20020. Hope Village, Inc. is a resident of the District of Columbia. Hope Village, Inc.

3

contracted with the D.C. Department of Corrections, the CSOSA, and/or the United States government to provide halfway house services to offenders in the District of Columbia. Mr. Micheli was in the custody of Hope Village in May 2018. Hope Village's registered agent is the C.T. Corporation System, and Hope Village may be served with process at 1015 15th St. NW, Suite 1000, Washington D.C., 20005.

10. This Court has jurisdiction over the claims against the United States pursuant to 28 U.S.C. §1331 and 28 U.S.C §2674. The Court has supplemental jurisdiction over the claims against the District of Columbia and Hope Village pursuant to 28 U.S.C. §1367.

11. Venue is proper under 28 U.S.C. §1391(b)(2). The events that led to Mr. Paavola's death occurred in the Middle District of Tennessee in Nashville.

## FACTS

12. Prior to April 2018, the Defendants collectively oversaw and were responsible for multiple inexcusable failures in the management, supervision, and detention of pretrial arrestees. These failures led to premature releases and/or failed efforts to apprehend detainees that should have been detained, leading to harm to the public.

13. For example, according to a Complaint filed in *Carol Smith v. Hope Village, Inc.* (Case No. 1:05CV00633, U.S. District Court for D.C.), Hope Village negligently released detainee Anthony Kelly in 2002. After his improper release, Mr. Kelly broke into a nearby home and murdered a nine-year old girl, E. S. E.S.'s mother filed a lawsuit.

14. According to the Washington Post, in the month prior to the events at issue in this lawsuit, a United States District Judge "castigated" the Defendants for a half-dozen erroneous inmate releases, and a high-profile mix-up involving an attempted murderer.

4

15. The Defendants knew of the serial lapses described in Paragraphs 12 - 14, but took no steps to prevent repetition of those errors, endangering the public.

16. On April 27, 2018, Mr. Micheli was arrested for trespassing at the White House in Washington, D.C. Mr. Micheli was detained in a D.C. jail until May 1, 2018.

17. After four (4) nights of incarceration, the initial appearance and arraignment occurred on May 1, 2018. Mr. Micheli appeared in person. Mr. Micheli claimed to be President, in town to lead the nation. He disclosed prior mental health care in Nashville. The United States sought detention of Mr. Micheli as a serious flight risk based on his statements to the Secret Service. A detention hearing was set for May 2, 2018.

18. On May 2, 2018, the Honorable G. Michael Harvey, U.S. Magistrate Judge, entered a Release Order, which stated "The D.C. Department of Corrections is Directed to Notify the Court Immediately by FAX of Defendant's Escape or Remand to the D.C. Jail. This Notification shall be Faxed to the Attention of the Criminal Clerk's Office (FAX # 535-0320) and will Be Forwarded to the Appropriate Judicial Officer."

19. Mr. Micheli was released to the third party custody of the D.C. Department of Corrections for placement in a halfway house. The terms of this release were governed, in part, by an Intergovernmental Agreement between the Department of Justice, U.S. Marshal's Service, and the D.C. Department of Corrections, updated as recently as January 24, 2017. The Intergovernmental Agreement required "Special Notifications." The D.C. Department of Corrections was required to "immediately notify the Federal Government of an escape of a federal detainee," and to use "all reasonable means to apprehend the escaped federal detainee." The D.C. Department of Corrections was

also required to immediately notify the U.S. District Court if Mr. Micheli did not comply with the terms of his release, including any efforts by Mr. Micheli to escape or abscond.

20. The terms of the Release also required the Pretrial Services Agency (PSA) to monitor Mr. Micheli to ensure compliance with the terms of his release and to ensure appearance at future hearings. Federal law, codified at 18 U.S.C. 3154, required the PSA to inform "the Court and the United States Attorney of all apparent violations of pretrial release condition," and "any danger that any such person may come to pose to any other person or the community." PSA failed to comply with this statutory mandate.

21. On May 9, 2018, Mr. Micheli underwent a mental competency evaluation. The examiner documented that Mr. Micheli provided irrational information. The exam was concerning, and a follow-up exam was scheduled for May 21, 2018. The Defendants were aware of, or should have been aware of, the results of the May 9th examination.

22. On May 15, 2018, Mr. Micheli checked into Hope Village halfway house, as required by the terms of the Release Order issued by the U.S. Magistrate Judge.

23. Another hearing was held on May 18, 2018 before United States District Judge Paul Friedman. Melvin Tildon from Pretrial Services attended the hearing. Mr. Tildon reported that Mr. Micheli arrived at Hope Village on May 15, 2018. A mental health assessment, with equivocal results, occurred on the morning of May 18, 2018. Another assessment with the "Department of Behavioral Health" was set for Monday, May 21, 2018. The matter was set for status conference or plea on June 14, 2018.

24. After May 18, 2018, Mr. Micheli failed to comply with the terms of his confinement at Hope Village. Hope Village, which was bound by a Statement of Work it agreed to, failed to timely notify the appropriate authorities, including the PSA and the D.C.

Department of Corrections, of Mr. Micheli's conduct, escape, or "absconded" status. The PSA, which had an independent oversight duty, also failed to notify the appropriate authorities of Mr. Micheli's failure to comply with the terms of his release. Despite having knowledge of Mr. Micheli's actions, Hope Village and the PSA failed to take any steps to ensure that Mr. Micheli was apprehended before he would harm the public.

25. After his escape from Hope Village, but before he murdered Mr. Paavola on June 4, Mr. Micheli posted a series of bizarre and deeply concerning messages on Facebook. For example, on May 26, 2018, Mr. Micheli claimed to be the "Sun of God" and warned that "there will not be any mercy doled out after this post." He boasted he could "kill nine tenths of the worlds [sic] population and be within justice." He threatened to "…keep going until everyone is drooling but me." Using these posts, law enforcement could have located and apprehended Mr. Micheli before he murdered Joel Paavola.

26. In advance of June 4, 2018, the D.C. Department of Corrections became aware that Mr. Micheli was not complying with the terms of the Release Order. The D.C. Department of Corrections failed to timely notify and/or failed to ever notify the appropriate parties' of Mr. Micheli's actions, and failed to take any steps to ensure that Mr. Micheli was apprehended before he could harm a member of the public.

27. On June 4, 2018, Mr. Micheli entered the premises at The Balance in Nashville and viciously attacked Joel Paavola using a meat cleaver and a tomahawk.

28. Striking with both the meat cleaver and the tomahawk, Mr. Micheli inflicted a series of multiple sharp and blunt force injuries:

   a) Three (3) chop injuries to the rear of Mr. Paavola's head, measuring 5 ¼ inches by ¾ inches.

7

b) Three (3) chop fractures of the occipital bone of Mr. Paavola's skull with bony fragmentation, and penetration into the left occipital lobe of Mr. Paavola's brain.

c) Fractures of the occipital, left temporal, left parietal, right ring of the sphenoid, frontal and right temporal bones of Mr. Paavola's skull.

d) Sharp wound to the left chin.

e) Traumatic fracture of the mandible, and the left upper incisor.

f) A sharp wound to the bridge of the nose.

g) A penetrating, sharp wound to the left forehead.

h) Penetrating and perforating stab wounds to the left upper chest.

i) Penetrating stab wound to the right shoulder.

j) Penetrating stab wound to the right lower abdomen.

k) A sharp wound to the right lower chest.

l) An incised wound to the right abdomen.

m) Seven (7) incised wounds to Mr. Paavola's upper back, covering an area 10 inches square.

n) Penetrating chop wound of the lateral aspect of Mr. Paavola's left foot fracturing the fifth tarsal bone.

o) Penetrating chop wound of the right hand distal to the anterior wrist crease, 9 ½ inches in length.

p) Fractures of the right wrist and fractures of the 2nd, 3rd and 4th carpal bones of Mr. Paavola's right hand.

q) Penetrating chop wound of the left hand, with a fracture of the 1st carpal bone of the left hand.

r) Multiple penetrating chop wounds of the palmar surface of the left hand, with incised wounds across the bases of left fingers 2, 3, 4 and 5.

s) Fractures of the proximal phalanges of left fingers 4 and 5, and a fracture of the proximal phalange of the left 5th finger.

t) Incised wounds to the back of the left finger, the palmer surface of the left 4th finger, the medial aspect of the left wrist, the right thigh, the left ankle, the anterior right arm, and the anterior right axilla.

29. Mr. Paavola died from devastating injuries to his skull and brain on June 4, 2018. Mr. Paavola's death could have been prevented but for the actions and/or inactions of Hope Village, the United States, and the District of Columbia.

30. Ms. Paavola is now a widowed mother of five (5) children.

## CAUSES OF ACTIONS

### COUNT ONE – NEGLIGENCE BY THE DISTRICT OF COLUMBIA / THE D.C. DEPARTMENT OF CORRECTIONS

31. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 30.

32. Plaintiffs bring a survival action against the District of Columbia and the D.C. Department of Corrections pursuant to D.C. Code §12–101 and/or a wrongful death action against the District of Columbia and the D.C. Department of Corrections pursuant to D.C. Code §16–2701. In the alternative, Plaintiffs bring a wrongful death action under Tenn. Code Ann. §20-5-101, *et. seq.*

9

33. Prior to April 27, 2018, District of Columbia was negligent by not taking steps to protect the public by correcting the errors and mistakes identified in Paragraphs 12-15.

34. In May and June 2018, the District of Columbia owed a duty to the public:

   a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

   b) to train its employees to appropriately manage and supervise detainees within its custody;

   c) to prevent negligent release of detainees within its custody and control;

   d) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement and/or was inappropriately released from confinement, as had occurred many times before;

   e) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

   f) to follow applicable internal policies and procedures;

   g) to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

   h) to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody; and

   i) to protect the community at large from bodily harm done by criminal offenders within its custody.

35. The District of Columbia also had a duty to make sure the parties with whom it contracted to detain persons within its custody complied with (a) the duties identified in

10

Paragraph 34, (b) all applicable contracts (such as the Intergovernmental Agreement and/or the Statement of Work), and (c) all applicable laws, regulations, and standards.

36. The District of Columbia voluntarily accepted the duties identified in Paragraphs 34 - 35 and profited by agreeing to perform them. The District knew detainees in its custody, including Mr. Micheli, were dangerous to the public. Despite accepting these obligations, the District failed to comply with its duties in Paragraphs 34 - 35.

37. The District breached the duties identified in Paragraphs 34 - 35 in its management of Mr. Micheli's confinement. This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee. But for the breach of duty by the District, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

38. Because of the District of Columbia's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

39. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled.

40. The District of Columbia is jointly and severally liable for Plaintiffs' injuries.

### COUNT TWO – NEGLIGENCE BY THE UNITED STATES / THE PRETRIAL SERVICES AGENCY

41. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 30.

42. Plaintiffs bring a survival action against the United States and the Pretrial Services Agency pursuant to D.C. Code §12–101 and/or a wrongful death action against the United States and the Pretrial Services Agency pursuant to D.C. Code §16–

11

2701. In the alternative, Plaintiffs bring a wrongful death action against the United States under Tenn. Code Ann. §20-5-101, *et. seq.*

43. Prior to April 27, 2018, the United States was negligent by not taking steps to protect the public by correcting the errors and mistakes identified in Paragraphs 12-15.

44. In May and June 2018, the United States and the PSA owed a duty to the public:

   a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

   b) to train its employees to appropriately manage and supervise detainees within its custody;

   c) to prevent negligent release of detainees within its custody and control;

   d) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement;

   e) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

   f) to follow applicable internal policies and procedures;

   g) to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

   h) to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody, including but not limited to 18 USC §1354(5); and

   i) to protect the community at large from bodily harm done by criminal offenders within its custody.

45. The United States also had a duty to make sure the parties with whom it contracted to detain persons within its custody complied with (a) the duties identified in Paragraph 44, (b) all applicable contracts (such as the Intergovernmental Agreement and/or the Statement of Work), and (c) all applicable laws, regulations and standards.

46. The United States failed to comply with its duties in Paragraphs 44 - 45.

47. The United States knew, or should have known based on available information, that detainees in its custody, including Mr. Micheli, were dangerous to the public.

48. The United States breached the duties identified in Paragraphs 44 - 45 in its management of Mr. Micheli's confinement. This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee. But for the United States' breaches, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

49. Because of the United States' actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

50. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled.

51. The United States is jointly and severally liable for Plaintiffs' injuries.

## COUNT THREE – NEGLIGENCE BY HOPE VILLAGE

52. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 30.

53. Plaintiffs bring a survival action against Hope Village pursuant to D.C. Code §12–101 and/or a wrongful death action against Hope Village pursuant to D.C. Code §16–

13

2701. In the alternative Plaintiffs bring a wrongful death action against Hope Village under Tenn. Code Ann. §20-5-101, *et. seq.*

54. Prior to April 27, 2018, Hope Village was negligent by not taking steps to protect the public by correcting the errors and mistakes identified in Paragraphs 12-15.

55. In May and June 2018, Hope Village owed a duty to the public:

   a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

   b) to train its employees to appropriately manage and supervise detainees within its custody;

   c) to prevent negligent release of detainees within its custody and control;

   d) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement;

   e) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

   f) to follow applicable internal policies and procedures;

   g) to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

   h) to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody; and

   i) to protect the community at large from bodily harm done by criminal offenders within its custody.

56. Hope Village was a party to a Statement of Work (SOW) that included the following contractual obligations:
    a) to immediately notify the Residential Reentry Manager ("RRM") if a resident failed to return to the Residential Reentry Center on time;
    b) to be able to "locate and verify the whereabouts of residents at all times;"
    c) to attempt to locate a resident after an escape;
    d) to report an escape, immediately, by phone to the RRM;
    e) to capture all pertinent details of an escape in an Escape Report (EMS-A907.073) and Incident Report (BP-A025); and
    f) to follow policies and procedures for reporting to the supervising authority.
57. Hope Village was also responsible for complying with Federal Performance Based Detention Standards, including, but not limited to:
    a) to maintain continuous accountability of all detainees;
    b) to perform at least one (1) physical count of detainee's on each shift; and
    c) to notify the Regional Director of the BOP, combined with immediate notice by telephone to the FBI and U.S. Marshals Service with submission of the Notice of Escaped Federal Prisoner by e-mail or fax.
58. Hope Village voluntarily accepted the duties identified in Paragraphs 54 - 57 and profited by agreeing to perform them. Hope Village knew or should have known based on the information available to it that detainees in its custody, including Mr. Micheli, were dangerous to the public and must be supervised. Despite willingly accepting these obligations, Hope Village failed to comply with its duties in Paragraphs 54 - 57.

59. Hope Village breached the duties identified in Paragraphs 54 – 57 in its management of Mr. Micheli's confinement. These breaches were the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee. But for the Hope Village's breaches, Mr. Micheli would have remained in confinement in D.C. and/or would have been apprehended prior to June 4, 2018.

60. Because of Hope Village's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal on June 4, 2018.

61. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled.

62. Hope Village is jointly and severally liable for Plaintiffs' injuries.

### COUNT FOUR AGAINST ALL DEFENDANTS – BREACH OF CONTRACT / THIRD-PARTY BENEFICIARY CLAIM

63. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 30.

64. Mr. Micheli was confined at Hope Village in May 2018, in part, pursuant to written contracts entered into (1) between the United States and the District of Columbia, (2) the District of Columbia and Hope Village, and (3) the United States and Hope Village.

65. These contracts were entered into to protect the public and contained specific provisions and requirements to ensure that the public was protected from inadequate supervision of pretrial detainees, premature release, and/or failure to take the appropriate steps to apprehend pretrial detainees who did not comply with court orders.

66. The Plaintiffs and Mr. Paavola were members of the public who were third-party beneficiaries of these contracts. The Defendants' individual and collective failure to adhere to the terms of the contracts identified in this Complaint breached the contracts.

Plaintiffs were significantly damaged from Defendants' breach, including but not limited to Mr. Paavola's injuries, Mr. Paavola's pain and suffering prior to death, Mr. Paavola's death, all economic damages (medical expenses, loss of future earnings, loss of support and services), and non-economic damages (loss of consortium) of the estate.

## DAMAGES

67. Due to Defendants' negligence and/or breach of contract, Plaintiffs have suffered extraordinary, devastating, and permanent damages. Mr. Paavola suffered violent injuries and unimaginable pain and suffering from the time of the attack until the time of death. Mr. Paavola lost his life on June 4, 2018 due to Defendants' collective action. Mr. Paavola's estate lost millions of dollars in future earnings and lost financial support and services. Ms. Paavola lost her husband. The Paavola children lost their father.

68. Plaintiffs seek all damages recoverable by law against the Defendants, such as economic damages - including medical expenses, business expenses, lost wages, lost support and services contributions, and lost cumulative earnings - and noneconomic damages - including loss of consortium, pain and suffering, and mental anguish.

69. Against Hope Village only, Plaintiffs seek punitive damages. Clear and convincing evidence demonstrates that Hope Village's conduct was reckless. Punitive damages are appropriate to punish Defendants and ensure this does not happen again.

70. Plaintiffs demand $30,000,000.00 in damages from the joint and severally liable Defendants. Because the United States is immune from punitive damages, the maximum damages sought from the United States is $10,000,000.00 (or their pro rata (1/3) portion of the $30,000,000.00 global demand sought from all Defendants).

71. In the event that Tennessee law controls, Plaintiffs allege that the applicable damage restrictions, codified at Tenn. Code Ann. §29-39-101, are unconstitutional.

### REQUEST FOR TRIAL BY JURY

72. Plaintiffs demand a jury to hear all issues identified in this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand a jury to try the case and assess damages against the Defendants, including -

a) All compensatory damages allowable;

b) Punitive damages due to Hope Village's reckless conduct;

c) All legally permitted pre-judgment and post-judgment interest;

d) Cost of suit; and

e) Such other and further relief to which they may be entitled.

Respectfully submitted,

GIDEON, COOPER & ESSARY, PLC

---

**C.J. Gideon, Jr. # 006034**
**J. Blake Carter, # 030098**
315 Deaderick Street, Suite 1100
Nashville, TN 37238
(615) 254-0400

*Counsel for Plaintiffs*