IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

LANA M. PAAVOLA, individually, and )
as Administrator of the ESTATE )
OF JOEL D. PAAVOLA, deceased )
)
      Plaintiffs, ) Civil Action No.: 3:19-cv-269
)
      v. ) Jury Demand
)
UNITED STATES OF AMERICA, )
DISTRICT OF COLUMBIA, and HOPE )
VILLAGE, INC., )
)
      Defendants. )

## AFFIDAVIT OF TRACIE CARTER

STATE OF TENNESSEE )
)
COUNTY OF DAVIDSON )

1. I am over 21 years of age and competent to make this Affidavit.

2. My testimony is based on my experience working as a paralegal at Gideon, Cooper, & Essary, PLC ("GCE"). I have been employed by GCE since 2016.

3. Ms. Paavola engaged Gideon, Cooper, & Essary, PLC in August 2018.

4. Between 08/2018 and present, I investigated this claim, but have been unable to obtain information regarding when Mr. Micheli escaped from Hope Village. Based on the transcripts attached as Exhibit A to this Affidavit, Mr. Micheli checked himself into Hope Village on 5/15/18. Mr. Micheli attended a status conference in D.C. on 5/18/18. On 5/18/18, Judge Friedman ordered Mr. Micheli to stay at Hope Village until another mental health assessment could be done on 5/21/18 (a Monday). We do not know, and have been unable to find out, whether Mr. Micheli ever underwent that assessment.

5. We do not when Mr. Micheli left Hope Village or what Hope Village did about it.

1

EXHIBIT 1

6. The next criminal status conference was scheduled for 6/14/18. It was delayed on 6/13/18. There is no indication in the criminal court docket why it was delayed.

7. Hope Village did not respond to a letter mailed by GCE on 9/26/18.

8. I have called several parties to ask for information, including the attorneys involved in Mr. Micheli's criminal case in Tennessee, and all declined to provide it.

9. I also attempted to interview the detective investigating Mr. Micheli's criminal case in Tennessee, and he could not provide me with any non-public information.

10. Despite reasonable presuit efforts, our research has been confined to publicly available documents[1] regarding the details of Mr. Micheli's escape from Hope Village.

11. I have personal knowledge that Mr. Micheli was employed by the Balance in Nashville, Tennessee from 2012 to 2017. Mr. Micheli lived in Tennessee.

**FURTHER AFFIANT SAY NOT.**

_Tracie Carter_
**Tracie Carter, Paralegal**

Sworn to and subscribed before me this 13TH day of MAY, 2019.

NOTARY PUBLIC
12.16.22

[STATE OF TENNESSEE NOTARY PUBLIC — JOAN LILLARD HAINES, MONTGOMERY COUNTY]

---

[1] See, e.g., Exhibit B (Washington Post article).

2

```
             UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA        :
                                :
          Plaintiff,            :   Criminal Action
                                :   No. 18-115
v.                              :
                                :
MAURICE MICHELI,                :   May 18, 2018
                                :   11:22 a.m.
                                :
                                :
          Defendant.            :   Washington, D.C.
                                :
. . . . . . . . . . . . . . . . :
```

TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE PAUL L. FRIEDMAN,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the United States: | **Maia Luckner Miller, Assistant U.S. Attorney**<br>U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA<br>National Security Section<br>555 4th Street NW<br>Office 11-445<br>Washington, DC 20530<br>(202) 252-6805<br>Email: Maia.miller@usdoj.gov |
| For the Defendant: | **Tony W. Miles, Assistant Federal Public Defender**<br>FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF COLUMBIA<br>625 Indiana Avenue, NW<br>Suite 550<br>Washington, DC 20004<br>(202) 208-7500<br>Fax: (202) 208-7515<br>Email: Tony_miles@fd.org |
| For the Probation Department: | **Melvin Tildon, Pretrial Services Officer** |

*Scott L. Wallace, RDR, CRR, Official Court Reporter*
*(202) 354-3196 * scottlyn01@aol.com*

**EXHIBIT A**

```
APPEARANCES:   Cont.


Court Reporter:                 Scott L. Wallace, RDR, CRR
                                Official Court Reporter
                                Room 6503, U.S. Courthouse
                                Washington, D.C. 20001
                                202.354.3196
                                scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

```
 1                MORNING SESSION, MAY 18, 2018
 2   (11:43 a.m.)
 3        THE COURTROOM CLERK:  Your Honor, this is Criminal Case
 4   Number 18-115, United States of America versus Dominic Lawrence
 5   Micheli.  The defendant is present.  Will counsel please approach
 6   the podium and identify yourselves for the record.
 7        MS. MILLER:  Good morning, Your Honor.  Maia Miller on
 8   behalf of the United States, and I apologize for my tardiness.
 9        THE COURT:  I should blame Judge Moss, not you.
10        MS. MILLER:  The defendant was a little lengthy.  Thank
11   you, Your Honor.
12        MR. MILES:  Good morning, Your Honor.  Tony Miles for
13   Micheli.
14        THE COURT:  Okay.  Good morning.  Mr. Micheli, good
15   morning.
16        THE DEFENDANT:  Good morning.
17        THE COURT:  And from pretrial.
18        THE PROBATION OFFICER:  Good morning, Your Honor.  Melvin
19   Tildon for Pretrial Services.
20        THE COURT:  Okay.  So who wants to say what?  Who wants to
21   start?
22        THE PROBATION OFFICER:  I will.
23        THE COURT:  All right.  Go ahead.  Do you all have
24   Mr. Tildon's report dated today, May 17th [sic]?  I have an
25   earlier one, but he just handed up one dated today, May 17th.
```

*Scott L. Wallace, RDR, CRR, Official Court Reporter*
*(202) 354-3196 * scottlyn01@aol.com*
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 5 of 18 PageID #: 97

1    MR. MILES:  Thursday.  Mine says Thursday, May 17th.
2    THE COURT:  You're correct.  Today is Friday.
3    MR. MILES:  Yes, I have that report.
4    THE PROBATION OFFICER:  Good morning, Your Honor.
5  Mr. Micheli has arrived to the halfway house, Hope Village, on
6  5-15 of this week.  He did report down for a mental health
7  assessment just this morning.  The results of that were
8  inconclusive.
9    THE COURT:  An assessment for?
10   THE PROBATION OFFICER:  A mental health assessment, Your
11 Honor, was ordered with the release order.  And he completed that
12 today with pretrial, but the results of that were inconclusive.
13 They have decided that he should have a further assessment with
14 the Department of Behavioral Health on Monday.
15   So, at this time, we aren't requesting any change in
16 conditions.  We just wanted to inform the Court of that update.
17   THE COURT:  Okay.  But I guess I don't understand.  Maybe
18 counsel can explain it to me.  There's a report on competency
19 from Magistrate Judge Harvey dated the 14th, and as I read it,
20 although it's not exactly a hundred percent clear, I think there
21 was a finding that he's competent to assist his counsel and to
22 participate in these proceedings and that he knows what's going
23 on.  So what's the reason for the further assessment?  That
24 doesn't have to do with competency, it has to do with mental
25 health.

1  THE PROBATION OFFICER: Yes. This is just in regards to
2  mental health. My understanding is that services were being
3  recommended as being needed, that it was a matter of not being
4  eligible -- well, being unsure if he's eligible for our
5  specialized supervision unit. Competency is not in issue at this
6  point.
7  THE COURT: Competency is no longer at issue, as I
8  understand it, so this is a mental health assessment, and there
9  will be a further assessment on Monday.
10  THE PROBATION OFFICER: Yes, sir.
11  THE COURT: Okay. I got it.
12  THE PROBATION OFFICER: Thank you.
13  THE COURT: And conditions, he's complying so far and he's
14  at Hope Village and no change is recommended.
15  THE PROBATION OFFICER: Yes, sir.
16  THE COURT: Okay. All right. Mr. Miles, you can
17  elucidate me.
18  MR. MILES: I think -- did you want me to address those
19  issues?
20  THE COURT: Yeah, just so the record is clear as to what's
21  happened, what's been found, and what's about to happen.
22  MR. MILES: Sure, Your Honor. What happened is the
23  government had a question as to my client's competency. In my
24  discussions with my client, I informed the Court that I did not
25  think competency was an issue, but there was a screening done

```
 1   over at the Superior Court, and the person who screened him did
 2   not find any problems with regard to competency, did not believe
 3   competency was an issue.
 4          So, as I understand Judge Harvey's order -- or not order,
 5   but memo, it's that -- I don't think it was technically a
 6   competency finding.  I think there's no reason that he even needs
 7   to -- that we need to send him away under 4241 --
 8          THE COURT:  -- for a longer period.
 9          MR. MILES:  Exactly, because it does appear he's competent
10   at this stage.  And so that was my understanding of the
11   memorandum, and it was also my understanding that Judge Harvey,
12   as a condition of his release, wanted him assessed for mental
13   health treatment, but that was apart from any issue regarding
14   competency.
15          THE COURT:  Okay.  Anything you want to add, Ms. Miller,
16   on that?
17          MS. MILLER:  No, Your Honor.  That's consistent with the
18   government's recollection as well.
19          THE COURT:  Okay.  So where are we and what's going to
20   happen next?  This is a misdemeanor, right?
21          MS. MILLER:  Yes, Your Honor, and this is not a situation
22   where the government expects to return additional -- or to file
23   additional charges.
24          And for the record, I just provided Mr. Miles discovery,
25   which the government believes represents all of the discovery in
```

1   this matter.  It's not a very complex case.  But in the event
2   that they are -- I find additional materials to provide
3   Mr. Miles, I will do that very quickly on an expedited basis.
4           THE COURT:  Are there videotapes involved?
5           MS. MILLER:  I don't believe there are videotapes
6   involved.  I do believe there are radio run communications
7   because this -- the genesis of this case is the defendant's
8   interactions with the uniformed division or uniformed officers
9   with the Secret Service who were stationed outside of the White
10  House.  So I believe they got on the radio once a transport was
11  required, and that has been disclosed to Mr. Miles.
12          THE COURT:  Okay.  So what are we going to do next in this
13  case?
14          MR. MILES:  So, Your Honor, I've already -- Frankly, I
15  sent an e-mail -- we've had some discussions about trying to
16  resolve it, and I've asked for a diversionary disposition in this
17  case and am waiting for a response.  That was sent yesterday, so
18  I'm not -- in fairness, I didn't expect a response today, but --
19  so that's how we hope to resolve the case.
20          THE COURT:  So when -- so you think -- you're talking
21  about a plea followed by or diversion in lieu of a plea?
22          MR. MILES:  In lieu of a plea.
23          THE COURT:  Okay.  Where is Mr. -- does Mr. Micheli live
24  in this area?
25          MR. MILES:  No.

Scott L. Wallace, RDR, CRR, Official Court Reporter
(202)354-3196 * scottlyn01@aol.com
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 9 of 18 PageID #: 101

```
 1            THE COURT:  Okay.
 2            MR. MILES:  He had been --
 3            THE COURT:  And so that's why he's at Hope Village?
 4            MR. MILES:  Yes.
 5            THE COURT:  So timing.  When do you want to do whatever
 6    we're going to do?
 7            MR. MILES:  I would defer to the government.  I don't know
 8    how long it will take for her to get back to our request -- with
 9    regard to my request.
10            THE COURT:  Ms. Miller.
11            MS. MILLER:  I'm able to respond.  The government is
12    rejecting the defendant's offer of resolution, and maintains our
13    initial plea, which is we will not oppose -- if the defendant
14    pleads guilty to the charge that he's facing, the government will
15    not oppose proceeding to sentencing as quickly as the defendant
16    would like and will not oppose time served, and the government's
17    in a position of leaving it open to defense counsel's preference
18    of the mechanism of the sentencing argument on behalf of the
19    government, meaning we certainly are happy to entertain -- I'm
20    not sure if a (C) plea is available in a misdemeanor, but to the
21    extent a (C) plea is available in a misdemeanor, the government
22    wouldn't oppose a request to present Your Honor with a (C) plea
23    to time served.
24            And if that's not an option, the government certainly
25    would not oppose a request that the government agree to allocute
```

*Scott L. Wallace, RDR, CRR, Official Court Reporter*
*(202) 354-3196 * scottlyn01@aol.com*
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 10 of 18 PageID #: 102

```
 1   for time served and not oppose the defendant's request for time
 2   served.
 3        THE COURT:  So, it doesn't sound like diversion is still
 4   on the table, but if you want to keep talking, I'm sure
 5   Ms. Miller will make herself available to talk.
 6        MR. MILES:  We will do that, Your Honor.  We just learned
 7   of that a moment ago.  So I suggest two or three weeks, that we
 8   come back for a status to see if we are able to resolve this
 9   matter.
10        THE COURT:  Okay.  Well, why don't we do this:  Today is
11   the 18th.  Can we put it down -- We'll agree on a date in a
12   minute.  I would suggest I put it down on my calendar for either
13   a status conference or a plea so that if your discussions about
14   first offender treatment don't work, and given what Ms. Miller
15   said, presumably the plea papers could be prepared reasonably
16   quickly.  So, if all of your discussions lead to the conclusion
17   that there's going to have to be a plea and your client agrees --
18   I mean, he doesn't have to plea, it's his decision, obviously.
19   I'll put it on my calendar for a status conference or plea and
20   we'll see where we are.
21        MR. MILES:  Sure.
22        THE COURT:  And I'm not forcing anybody into anything.
23   Today's the 18th.  Can we do it the week of the 11th?
24        MR. MILES:  Yes, Your Honor.
25        THE COURT:  Because I'm away the week of the 4th.
```

Scott L. Wallace, RDR, CRR, Official Court Reporter
(202) 354-3196 * scottlyn01@aol.com
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 11 of 18 PageID #: 103

1    MS. MILLER:  That's fine for the government.  The only day
2  that would be bad for me would be the 15th and the 13th, but
3  otherwise I'm completely open.
4    THE COURT:  I'm happy to do it the morning of the 12th or
5  the morning of the 14th.
6    MR. MILES:  How about the morning of the 14th, Your Honor?
7    THE COURT:  Okay.  So that's Thursday, June 14th.  What
8  time?
9    MS. MILLER:  10:00 works if you want to do the morning.
10 If you would like to do earlier, that's fine for the government.
11   THE COURT:  Are you sure that's all right with Judge Moss.
12   MS. MILLER:  Judge, I'm not before -- certainly I
13 appreciate that.  That's not until the end of June.
14   MR. MILES:  10:00.
15   THE COURT:  10:00 on June 14th.  And if it turns out it's
16 going to be a plea, Ms. Miller, would you make sure that I've got
17 those papers at least the day before so I can look at them before
18 I come to court?
19   MS. MILLER:  Yes, Your Honor.
20   THE COURT:  And if the idea is an immediate sentencing,
21 then we -- I'm happy to do that, if that's what everybody wants
22 to do.
23   MS. MILLER:  Yes, Your Honor.  I'll make sure -- if it
24 turns out from the government's perspective -- you know, if the
25 defendant accepts our plea offer and we proceed to sentencing on

Scott L. Wallace, RDR, CRR, Official Court Reporter
(202) 354-3196 * scottlyn01@aol.com
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 12 of 18 PageID #: 104

1  that date, I also will make sure that when we submit the plea
2  paperwork that I'll submit a government's memorandum in aid of
3  sentencing, although I don't know if we really would submit a
4  memorandum in aid of sentencing since we agree to time served.
5           THE COURT:  Well --
6           MS. MILLER:  But I might put something on the record.
7           THE COURT:  And again, you're going to look into
8  whether -- I haven't looked just now whether a (C) plea is
9  available on a misdemeanor.  Otherwise, your representations will
10 have to be in the plea letter and/or in some other document or
11 both.
12          And so -- and Mr. Miles, you have -- you have explained to
13 your client what's going on and you will explain further to make
14 sure he fully understands the discussions that we've just had on
15 the record?
16          MR. MILES:  Yes.
17          THE COURT:  Okay.  So, stay at Hope Village.  Pretrial
18 will let you and me know if there's any problems.  He'll have a
19 further mental health assessment on Monday, and the government
20 and the defense will continue talking to each other and see if
21 Mr. Miles can be his often persuasive self with the government.
22 And if not, we'll see what the alternatives -- we know what the
23 alternative is, and we'll see if that's agreeable to the
24 defendant.
25          MS. MILLER:  The only other thing I would add, Your Honor,

Scott L. Wallace, RDR, CRR, Official Court Reporter
(202) 354-3196 * scottlyn01@aol.com
Case 3:19-cv-00269   Document 22-1   Filed 05/14/19   Page 13 of 18 PageID #: 105

```
 1   is I'm not sure with the misdemeanor, but is this a situation
 2   where we need to exclude time from the Speedy Trial Act
 3   computations between now and --
 4         THE COURT:  There are no motions sitting on the calendar?
 5         MS. MILLER:  There are no motions, although now the
 6   parties are entering into plea discussions where it seems as
 7   though Mr. Miles may want more time and in the interest of
 8   justice to pitch my office.
 9         THE COURT:  I agree.  Have you talked to your client?
10         MR. MILES:  I have already, Your Honor.  I anticipated
11   this may be an issue today, and because I will take another stab
12   at diversion, I think it's in his -- certainly in his interest, I
13   would argue, and the public's interest that we exclude time
14   between today and the 14th of June, and we believe that interest
15   outweighs his interest and the public's interest in a speedy
16   trial.
17         THE COURT:  Mr. Micheli, could you stand up for a minute,
18   please?  Good morning.
19         THE DEFENDANT:  Good morning.
20         THE COURT:  Do you understand that you have a right to a
21   speedy trial?
22         THE DEFENDANT:  Yes.
23         THE COURT:  And are you willing to give up that right
24   between now and when we come back here on June 14th to allow your
25   lawyer to spend some time talking with the government about a
```

```
 1   resolution of this case?
 2          THE DEFENDANT:  Yes, I am.
 3          THE COURT:  Okay.  Good.  Thank you.  Feel free to call
 4   Mr. Miles any time you need to and talk to him.  He'll come tell
 5   me if there's anything I need to know.
 6          THE DEFENDANT:  I will.
 7          THE COURT:  Okay.  Thank you.  So, I find for the reasons
 8   that Mr. Miles and Ms. Miller just stated, and with the agreement
 9   of the defendant, that it's in the interest of justice to toll
10   the running of the speedy trial between now and June 14th when we
11   will be back here again.  So, is there anything else anybody
12   wants to raise?
13          MR. MILES:  No, Your Honor.  Thank you.
14          MS. MILLER:  No, Your Honor.
15          THE COURT:  Okay.  All right.  Until this afternoon.
16          (Proceedings adjourned at 11:58 a.m.)
17
                       C E R T I F I C A T E
18
19               I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
20   proceedings in the above-entitled matter.
21
            /s/ Scott L. Wallace                    6/7/18
22          ------------------------------      -----------------
            Scott L. Wallace, RDR, CRR                Date
23             Official Court Reporter
24
25
```

The Washington Post
Public Safety

# An alleged murder by absconding inmate prompts relocation of D.C. Jail prisoners to Virginia

By Spencer S. Hsu
July 15

U.S. marshals have transferred scores of D.C. Jail inmates awaiting federal trial to jails across Virginia after a defendant walked out of a Southeast Washington halfway house and days later allegedly killed his former employer in Tennessee.

Federal marshals have been frustrated for months over lapses in prisoner tracking by local District authorities.

After Domenic Micheli absconded, the D.C. Department of Corrections and pretrial services officials failed to notify U.S. marshals he was missing, according to several District and federal officials familiar with the incident. An arrest warrant was issued only after he was wanted in the Tennessee death, the officials said.

Pretrial defendants ordered held by federal district court in D.C. are the responsibility of the U.S. Marshals Service, which pays local jails to hold them under contract.

The lapse with Micheli aggravated a long-running dispute between federal and District authorities over prisoner monitoring mistakes by the D.C. Jail, including inmates released too soon and inmates held longer than they should have been. Federal judges have said the errors pose a significant public safety problem.

Micheli had been arrested in April near the White House and charged with a federal misdemeanor after refusing to remove his vehicle from a Secret Service checkpoint.

Rob Turner, acting U.S. Marshal for the U.S. District Court in the District, said the marshals recently moved 65 out of the roughly 700 federal prisoners to regional jails "due to challenges with the performance of D.C. Jail."

Turner said he recognized the "significant effort" District officials have made to improve prisoner monitoring and the ongoing collaboration to better track prisoner movements, but concluded in arranging the relocations that "public safety is a primary concern for all law enforcement officers."

Micheli was ordered released to the custody of the D.C. corrections department for transfer to a halfway house on May 2. The department said he was reported as an escapee May 23, but the notice evidently did not go to the marshals service for the federal court.

Elected D.C. officials, including Mayor Muriel E. Bowser (D), objected to the marshals' moving the inmates two or more hours' drive from the District. Some defense advocates and judges said the relocation has burdened court operations with the added logistics of shuttling defendants greater distances, raised hurdles for defendants' preparing their cases and strained inmate families.

"I would call it a colossal mistake," Charles Allen (D-Ward 6), chairman of the D.C. Council committee on public safety and the judiciary, said of the marshals' response. "To take D.C. residents who are awaiting trial and move them two hours away is not a way to solve whatever problems they have with the D.C. Department of Corrections ... I sure hope there isn't a cost-saving behind this, because that would be the absolute worst reason to make a decision."

The marshals service reimburses the District $122 a day for each federal prisoner that the jail or contractors, such as halfway houses, hold. The daily rate is as low as $60 when inmates are in outlying regional detention centers, the marshals service said.

But, Turner said, "cost is not a factor in this decision" to move the inmates. The marshals service declined to say where the inmates were sent. However, several defense lawyers, who spoke on the condition of anonymity because they were referring to client matters, said inmates were shifted to



facilities including Northern Neck Regional Jail, 90 miles away from D.C. in Warsaw, Va., and Piedmont Regional Jail, 180 miles away near Farmville in southside Virginia.

Federal judges including U.S. District Chief Judge Beryl A. Howell of the District have been troubled for months about jail operations and communication breakdowns with the federal marshals service.

The Micheli incident came less than a month after a federal judge castigated D.C. corrections officials for a half-dozen erroneous inmate releases and a high-profile mix-up involving a Prince George's County man housed in D.C. jail in a pending federal case. That man was on the verge of being released to await trial, despite also having a separate hold order from Prince George's County, where he was facing an attempted murder charge.

U.S. District Judge Emmet G. Sullivan said after the near miss release that he did not want to intercede directly in jail operations "but I can and I will if necessary."

The anxieties among federal judges escalated after Micheli walked off in May from the halfway house and days later was accused of the killing.

Micheli, 36, was arrested in his bloody car near Bowling Green, Ky., after witnesses told police he used a hatchet and knife on June 4 to kill his former boss at a Nashville gym from which he had been fired, Nashville police said. He has been charged with criminal homicide in Davidson County, Tenn., according to court records.

Micheli's defense attorney in the District, Assistant Federal Defender Tony W. Miles, declined to comment on the case, as did a spokeswoman for the Nashville metropolitan public defender's office, including about whether Micheli has entered a plea.

After Micheli's arrest in the killing, Howell, the chief federal judge, and council member Allen each summoned District officials to address the continuing errors involving federal inmates detained at D.C. facilities.

At a June 28 council committee hearing, D.C. corrections chief Quincy L. Booth told Allen's panel the department "takes responsibility" for identifying the causes and remedies for six mistaken releases in the last year and has disciplined workers and boosted staff, training, and coordination with U.S. marshals.

"Even one erroneous release is too many, and we are committed to a zero-tolerance policy on any recurrences," Booth said, adding that the District has hired an external consultant, the Moss Group, to recommend improvements by Sept. 1.

Federal judges have met with Del. Eleanor Holmes Norton (D) and her staff, the office of D.C. Attorney General Karl A. Racine, Deputy Mayor for Public Safety and Justice Kevin Donahue and Bowser's legal counsel and chief lobbyist to hammer out differences, Booth testified.

"Mayor Muriel Bowser and the Department of Corrections take this issue extremely seriously," Booth told the council, and are "fully committed" to working with federal partners to improve coordination, accountability and safety.

A spokeswoman declined to elaborate on Bowser and Donahue's concerns except to refer to Booth's statement. Norton's spokesman did not respond to a request for comment.

Howell is monitoring the department's progress and has asked for regular updates, a court official said. A court spokeswoman declined to comment.

**Read more:**

Federal prisons abruptly cancel policy that made it harder, costlier for inmates to get books

Paul Manafort had phone, email, "VIP' treatment in jail, prosecutors say



Spencer S. Hsu
Spencer S. Hsu is an investigative reporter, two-time Pulitzer finalist and national Emmy Award nominee. Hsu has covered homeland security, immigration, Virginia

The Washington Post
# The story must be told.
Your subscription supports journalism that matters.

Try 1 month for $1